UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/30/2026
```

SILVO R. ILLESCAS,

                          Plaintiff,

    -against-

ANTHONY J. ANNUCCI, Acting Commissioner of
the New York State Department of Corrections, *et al.*,

                          Defendants.

No. 21-CV-8473 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge:

*Pro se* Plaintiff Silvio R. Illescas ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Anthony J. Annucci, Acting Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); Dr. John Morley, Deputy Commissioner and Chief Medical Officer of DOCCS; Dr. Robert V. Bentivegna, Supervisor of Medical Care at Green Haven Correctional Facility ("GHCF"); Albert Acrish, Nurse Practitioner ("NP") at GHCF; Susanna Nayshuler, Regional Health Services Administrator ("RHSA") for DOCCS; Dr. "Mohamme," Dr. Kyoung Kim, and Dr. Olayemi Odeniyi, medical providers at GHCF; Mary N. Ashong, NP at GHCF; Nicole T. Thompson, Registered Nurse ("RN") at GHCF; John Doe #1 and John Doe #2, medical personal at GHCF; John Doe #3, correctional officer at GHCF (collectively, the "State Defendants"); Vassar Brothers Medical Center ("Vassar Brothers"); Dr. Sajin A. Pillai, Dr. Bruce R. Gendron, Dr. Daniel E. Laurie, Dr. Hector Ojeda-Martinez, Dr. Robert U. Mmereole, and Sehrish Shahid, medical providers at Vassar Brothers (collectively, the "Vassar Defendants"), and Dr. Jesse M. Wolstein, a former Vassar Brothers physician, alleging

violations of the Eighth and Fourteenth Amendments, as well as Article I, § 5 of the New York State Constitution.[1]

Plaintiff alleges that, during his hospitalization for COVID-19 and related conditions in April 2020, the Vassar Defendants administered medications without his informed consent and failed to disclose associated risks. Plaintiff further alleges that, following his hospitalization, the State Defendants failed to provide adequate medical care despite his persistent and worsening symptoms, including severe gastrointestinal pain and complications associated with a pancreatic tumor. Pending before the Court are Defendants' Motions to Dismiss (the "Motions") the Third Amended Complaint ("TAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).[2] (ECF Nos. 216–219.)

For the foregoing reasons, Defendants' Motions are GRANTED in their entirety.

## FACTUAL BACKGROUND

The following facts are drawn from the TAC, (ECF No. 215), and are assumed as true for the purposes of the Motions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### I.    Hospitalization at Vassar Brothers Medical Center

Plaintiff, a former inmate of GHCF, began experiencing certain medical symptoms possibly related to COVID-19 in April 2020. (TAC ¶ 10.) As a result, he went to the GHCF medical clinic, where he remained for approximately five days before being transported on April 9, 2020, to Vassar Brothers in Poughkeepsie, New York. (*Id*. ¶ 11.) Prior to transport, Plaintiff's vital signs, including his temperature, were recorded within normal limits. (*Id*. ¶ 13.)

---

[1] The TAC does not specify whether Plaintiff brings claims against the State Defendants in their official or individual capacities. (*See* generally TAC.) In his opposition papers, however, Plaintiff clarifies that he is pursuing claims against the State Defendants in their official capacities only. (ECF No. 238, "Pl. Opp." at 2.) The Court, in an abundance of caution, nonetheless considers whether Plaintiff plausibly states a claim under either theory, as discussed below.

[2] The Court refers to Defendants' memoranda of law in support of their motions to dismiss as follows: (1) ECF No. 244 ("State Mem."); (2) ECF No. 246, Ex. 3 ("Wolstein Mem."); and (3) ECF No. 248, Ex. 2 ("Vassar Mem.").

At Vassar Brothers, Plaintiff was evaluated and treated by multiple physicians and received several diagnoses, including COVID-19, pneumonia, abnormal liver enzymes, and Non-ST-elevation myocardial infarction.  (*Id*. ¶¶ 17–21.)  Plaintiff alleges that, following these diagnoses, certain of the Vassar Defendants administered medications without his consent and failed to inform him of the associated risks or side effects.  (*Id*. ¶¶ 20, 35.)  Plaintiff alleges that Defendants Dr. Robert U. Mmereole, Dr. Jesse M. Wolstein, Dr. Sajin A. Pillai, Dr. Daniel E. Laurie, Dr. Hector Ojeda-Martinez, and Sehrish Shahid, were among those who ordered and prescribed these medications.  (*See generally id*. ¶¶ 17–49.)  According to Plaintiff, the Vassar Defendants acted with "significant encouragement" from GHCF and State Defendants in providing his treatment. (*Id*. ¶ 43.)

## II.    Treatment at GHCF Following Discharge

### A.  Post-Discharge Medical Treatment in 2020

Plaintiff was eventually discharged from Vassar Brothers on April 13, 2020.  (*Id*. ¶ 41.) Given that Plaintiff was diagnosed with COVID-19, he was placed in a COVID-19 unit at GHCF. (*Id*. ¶ 51.)  During this time, Plaintiff experienced shortness of breath, dizziness, diarrhea, and stomach pain.  (*Id*. ¶ 50.)  Plaintiff alleges that he was only provided with oxygen as treatment. (*Id*. ¶ 52.)  On April 20, 2020, Plaintiff returned to his cell despite these ongoing symptoms.  (*Id*. ¶ 53.)  Plaintiff then began experiencing a range of additional medical issues, including pain in his lungs, kidneys, stomach, back, joints, testicles, groin, and rectum, as well as hair loss and persistent sneezing.  (*Id*. ¶ 54.)  Plaintiff thereafter submitted written complaints to the GHCF medical clinic detailing his symptoms.  (*Id*. ¶ 55.)

After several visits to the GHCF medical clinic, Plaintiff was evaluated on May 7, 2020, by Defendant Albert Acrish, an NP at GHCF and Plaintiff's primary medical provider.  (*Id*. ¶ 56.)

During this appointment, NP Acrish ordered a stool sample from Plaintiff, which returned negative. (*Id*.) Plaintiff alleges that, notwithstanding his continued complaints and disagreement with the results, NP Acrish did not order further testing. (*Id*.) Plaintiff thereafter filed a grievance on May 29, 2020, alleging that he was receiving inadequate medical care and requested a full medical examination. (*Id*. ¶ 57.) Plaintiff also submitted several additional sick call requests. (*Id*. ¶ 58.)

Plaintiff subsequently received an additional appointment with NP Acrish on June 4, 2020, at which he reiterated his symptoms. (*Id*. ¶ 58.) NP Acrish informed Plaintiff that his symptoms were likely attributable to COVID-19 and that he had "no problem" and would be "okay." (*Id*. ¶ 59.) Plaintiff again met with NP Acrish on June 23, 2020, at which time he underwent blood work. (*Id*. ¶ 60.) According to Plaintiff, NP Acrish informed him that his results were negative but refused to allow Plaintiff to review them. (*Id*.) On June 29, 2020, Plaintiff received a decision on his May 29, 2020 grievance directing GHCF to provide him with adequate medical care. (*Id*. ¶ 61.) Plaintiff alleges that, notwithstanding this determination, he did not receive additional treatment. (*Id*.) Plaintiff thereafter appealed the grievance to the GHCF Superintendent and submitted additional complaints regarding inadequate medical treatment. (*Id*. ¶¶ 61–64.)

Shortly thereafter, Plaintiff wrote to Defendant Dr. Robert V. Bentivegna, Supervisor of Medical Care at GHCF, on August 6, 2020, requesting that NP Acrish be removed as his primary care provider on the ground that NP Acrish had ignored his medical symptoms. (*Id*. ¶ 65.) The following day, Plaintiff received a letter from Dr. Bentivegna denying that request. (*Id*. ¶ 66.) Dr. Bentivegna explained, among other things, that Plaintiff's medical records did not reflect complaints concerning rectal issues. (*Id*.) Plaintiff alleges that this explanation was inconsistent with his prior letters and sick call requests in which he reported such symptoms. (*Id*.) On that same date, the GHCF Superintendent denied Plaintiff's grievance appeal. (*Id*. ¶ 67.) Plaintiff also

underwent a tuberculosis blood test, the results of which he alleges were never provided to him. (*Id*. ¶ 68.)

Plaintiff continued to submit complaints to various parties, including a renewed request on August 12, 2020, to change his primary care provider to Dr. Bentivegna, asserting that NP Acrish had failed to address his complaints of rectal pain. (*Id*. ¶ 69.) That request was again denied. (*Id*. ¶ 70.) Plaintiff thereafter submitted multiple complaints to the GHCF medical clinic describing ongoing symptoms, including swelling and pain in his rectum, pain in his lungs and back, dizziness, hair loss, and diarrhea. (*Id*. ¶¶ 70–72.) On August 26, 2020, Plaintiff was again seen by NP Acrish, who informed him that "everything looks good" despite his reported symptoms. (*Id*. ¶ 73.)

Sometime thereafter, Plaintiff sent a letter to the Ecuadorian Consulate seeking assistance in obtaining medical care. (*Id*. ¶ 74.) On September 2, 2020, the Ecuadorian Consulate sent a letter to the GHCF Superintendent requesting that Plaintiff receive medical attention. (*Id*. ¶ 75.) Plaintiff also received correspondence from the Ecuadorian Consulate on September 9, 2020, indicating that it intended to speak with the GHCF Superintendent regarding his medical care. (*Id*. ¶ 76.) On September 30, 2020, Plaintiff underwent an additional blood test at the GHCF medical clinic but alleges that he was not provided with the results. (*Id*. ¶ 77.) Plaintiff further alleges that, on October 9, 2020, he underwent a CAT scan at Putnam Hospital Center ("PHC") but likewise did not receive the results of that examination. (*Id*. ¶ 78.)

### B. Continued Medical Treatment at GHCF in 2021

Throughout late 2020 and early 2021, Plaintiff continued to submit written complaints to the GHCF medical clinic describing persistent symptoms, including severe abdominal pain, dizziness, and an inability to eat. (*Id*. ¶¶ 80–82.) Plaintiff also continued visiting NP Acrish. (*Id*.

¶ 81.) During one of Plaintiff's appointments, NP Acrish collected a urine sample from Plaintiff. (*Id*.) As before, Plaintiff alleges that he did not receive the results of the medical test performed on his sample. (*Id*.)

On February 12, 2021, Plaintiff sent a letter to the Central Office Review Committee ("CORC") stating that several months had passed without resolution of his grievance appeal and that he continued to receive inadequate medical care from NP Acrish. (*Id*. ¶ 83.) On March 3, 2021, CORC advised Plaintiff to continue utilizing the sick call procedure. (*Id*. ¶ 84.) Thereafter, on March 10, 2021, Plaintiff wrote to Defendant Dr. John Morley, Deputy Commissioner and Chief Medical Officer of DOCCS, detailing his treatment at Vassar Brothers and his continued symptoms, including diarrhea, stomach pain, and rectal swelling. (*Id*. ¶ 85.) In response, Defendant Susanna Nayshuler, RHSA for DOCCS, replied on behalf of Dr. Morley, directing Plaintiff to continue seeking care through the GHCF medical staff. (*Id*. ¶ 86.) However, Plaintiff alleges that despite these communications, NP Acrish continued to refuse to provide adequate treatment. (*Id*. ¶¶ 85–86.) Plaintiff further alleges that he continued to submit weekly complaints, both written and verbal, to GHCF medical staff and correctional officers regarding his worsening condition. (*Id*. ¶¶ 87–88.)

Later in the year, on July 13, 2021, NP Acrish informed Plaintiff that he had a stomach infection, gastroesophageal inflammation, and gastric ulcers. (*Id*. ¶ 89.) Plaintiff alleges that this diagnosis came approximately fifteen months after his initial complaints of abdominal pain. (*Id*.) NP Acrish thereafter prescribed Amoxicillin, Omeprazole, and Metronidazole. (*Id*. ¶ 90.) Plaintiff alleges, however, that these medications worsened his symptoms. (*Id*.) On July 23, 2021, Plaintiff was brought to the GHCF medical clinic on an emergency basis after correctional staff observed him in severe pain in his cell. (*Id*. ¶ 91.) At that time, Plaintiff complained of intense stomach

pain, burning sensations, dizziness, and fever. (*Id*.) Defendant John Doe #1, a GHCF medical staff member, informed Plaintiff that he would have to wait until the following week to see NP Acrish and provided only mild pain medication. (*Id*. ¶ 92.) As a result, Plaintiff submitted additional complaints to the GHCF medical clinic stating that his prescribed medications were worsening his symptoms. (*Id*. ¶ 93.)

Plaintiff sought medical attention again on July 25, 2021, but Defendant John Doe #2, a nurse at GHCF, informed him that no treatment could be provided at that time and that he would need to wait for an appointment with NP Acrish. (*Id*. ¶ 94.) Plaintiff alleges that John Doe #2 provided him with expired medication for his fever. (*Id*.) On August 1, 2021, Plaintiff was finally seen by NP Acrish. (*Id*. ¶ 95.) During that visit, Plaintiff again reported worsening symptoms, including stomach pain, dizziness, and hair loss. (*Id*. ¶ 96.) According to Plaintiff, NP Acrish stated that he had never seen these types of complications in any other patient. (*Id*. ¶ 97.) NP Acrish subsequently dismissed these complaints, stating that "everything was good," and returned Plaintiff to his cell without further evaluation. (*Id*.)

### C. Outside Medical Treatment and Subsequent Care in 2022

In the following weeks, Plaintiff continued to submit written complaints requesting additional diagnostic testing, including a colonoscopy, x-rays, and other imaging studies, as well as evaluation by a specialist. (*Id*. ¶¶ 98–101.) Plaintiff alleges that these requests were not promptly addressed. (*Id*.)

On February 13, 2022, Plaintiff renewed his complaints concerning NP Acrish to Dr. Bentivegna. (*Id*. ¶ 104.) Dr. Bentivegna responded on February 16, 2022, directing Plaintiff to discuss his symptoms with NP Acrish. (*Id*. ¶ 105.) Plaintiff continued to submit sick call requests throughout February and March 2022 describing persistent pain and other medical complications.

(*Id*. ¶ 106.)  On March 21, 2022, Plaintiff filed a second grievance requesting a full diagnosis, treatment by a specialist, and transportation to an outside hospital.  (*Id*. ¶ 107.)

Plaintiff was subsequently transported to Montefiore Mount Vernon Hospital ("MMVH") in Mt. Vernon, New York, on April 6, 2022, where he underwent a colonoscopy.  (*Id*. ¶ 108.) Plaintiff was then transported to Westchester Medical Center ("WMC"), in Valhalla, New York, for further evaluation on April 21, 2022.  (*Id*. ¶ 110.)  Plaintiff alleges that Defendant John Doe #3, a correctional officer responsible for transporting him, delayed his access to treatment by leaving him in a transport vehicle for over an hour before entering the hospital.  (*Id*. ¶ 111.)  At WMC, Plaintiff was examined by medical staff, who identified additional gastrointestinal conditions and a tumor in his pancreas.  (*Id*. ¶ 112.)  Plaintiff alleges that these providers recommended follow-up testing at six months and one year to monitor the tumor.  (*Id*. ¶ 113.) Plaintiff further alleges that, despite these recommendations, Defendants—including NP Acrish and other GHCF medical staff—failed to ensure that he received timely follow-up care.  (*Id*. ¶ 114.)  Plaintiff's subsequent grievances were denied by GHCF officials, who determined that Plaintiff was receiving appropriate medical care.  (*Id*. ¶¶ 115–116.)  Dr. Bentivegna concurred, stating that GHCF had already scheduled a procedure to be performed at WMC.  (*Id*. ¶ 117.)

In the months following the denial of his grievances, Plaintiff alleges that he continued to experience recurring symptoms, including stomach pain, diarrhea, and difficulty digesting food, and repeatedly sought treatment from GHCF medical staff.  (*Id*. ¶¶ 121–124.)  Plaintiff alleges that he informed Defendant Dr. Kyoung Kim who ignored his concerns and prescribed only Diotame for his diarrhea.  (*Id*. ¶ 121.)  Plaintiff also alleges that Defendant Dr. Olayemi Odeniyi similarly ignored his concerns.  (*Id*. ¶ 123.)  He further contends that NP Acrish responded angrily to his complaints, denied his requests for treatment, and failed to document his complaints in his medical

records. (*Id*. ¶ 124.) Plaintiff thereafter returned to the GHCF medical clinic in early September 2022 and complained to Defendant "Dr. Mohamme," a GHCF doctor, of his ongoing symptoms, requesting both treatment and referral to a gastrointestinal specialist. (*Id*. ¶ 125.) Plaintiff alleges that Dr. Mohamme denied that request, did not provide treatment, and failed to record the visit. (*Id*.) Later that month, Plaintiff was seen by Defendant Mary N. Ashong, a GHCF NP, to whom he again reported his recurring symptoms. (*Id*. ¶ 126.) According to Plaintiff, NP Ashong did not address his complaints and instead conducted only a weight check before returning him to his cell. (*Id*.)

Plaintiff returned to the GHCF medical clinic in October 2022 and again complained to NP Ashong, requesting to be transported to WMC for follow-up procedures recommended by outside physicians. (*Id*. ¶ 127.) Plaintiff alleges that NP Ashong refused to document his complaints, declined to provide treatment, and denied his request for outside care. (*Id*.) In November 2022, RHSA Nayshuler responded to a complaint Plaintiff had directed to higher-level DOCCS officials, stating that Plaintiff's medical care was "timely" and "appropriate" and was being monitored by his primary care provider, NP Acrish. (*Id*. ¶ 128.) Plaintiff alleges that this response disregarded his ongoing complaints. (*Id*.) Around this time, Dr. Bentivegna again denied Plaintiff's request to change his primary care provider, noting that Plaintiff already had a pending procedure with WMC concerning the mass on his pancreas. (*Id*. ¶ 129.) Plaintiff alleges that, notwithstanding this acknowledgment, no action was taken to ensure that he received the recommended follow-up care. (*Id*.)

### D. Continued Medical Treatment, Hospitalization, and Subsequent Care in 2023

Plaintiff continued to submit written complaints into early 2023, describing worsening symptoms, including stomach pain, diarrhea, bloody stool, and difficulty eating, and again

requested to be transported to WMC for follow-up care.  (*Id*. ¶ 136.)  Shortly thereafter, Plaintiff again visited the GHCF medical clinic and complained to NP Ashong on February 6, 2023, who informed him that she would relay his concerns to NP Acrish.  (*Id*. ¶ 137.)  Plaintiff contends that he had already repeatedly informed NP Acrish of these symptoms without receiving treatment. (*Id*.)  Later that month, on February 26, 2023, Plaintiff returned to the GHCF medical clinic in severe pain, including unrelenting stomach and back pain that made it difficult to sit or lie down. (*Id*. ¶ 138.)  Defendant Nicole T. Thompson, a GHCF RN, allegedly informed Plaintiff that he would need to see his primary care provider to receive treatment and returned him to his cell without further care.  (*Id*.)

On February 27, 2023, correctional officers transported Plaintiff to MMVH.  (*Id*. ¶ 139.) At MMVH, Plaintiff underwent multiple diagnostic procedures, including a CAT scan, MRI, endoscopy, and blood testing.  (*Id*. ¶ 140.)  He remained hospitalized for approximately nine days in critical condition.  (*Id*. ¶ 141.)  During that hospitalization, treating physicians informed Plaintiff that he had a tumor on his pancreas requiring further monitoring and treatment.  (*Id*.)  Plaintiff further alleges that medical records from MMVH reflected the presence of multiple pancreatic abnormalities, including a persistent cystic lesion, a new heterogeneous mass, and additional fluid and cystic formations in the pancreas.  (*Id*. ¶ 142.)  Plaintiff was discharged back to GHCF on March 7, 2023, at which time a nurse prescribed Pantoprazole and returned Plaintiff to his cell. (*Id*. ¶ 143.)

Ten days later, on March 17, 2023, Plaintiff was seen by Dr. Thomas Rush, an unaffiliated GHCF doctor, regarding his pancreatic tumor.  (*Id*. ¶ 144.)  Plaintiff alleges that no translator was provided during this visit, limiting his ability to understand the proposed surgical procedure and its risks.  (*Id*.)  According to Plaintiff, Dr. Rush informed him that surgery was his only option and

stated that the tumor was not growing, which Plaintiff later learned was inaccurate. (*Id*.) Plaintiff further alleges that he attempted to discuss prior recommendations from a WMC physician, Dr. Dimitrios Georgostathis, who had advised that surgery might not be necessary if the tumor was not growing. (*Id*. ¶ 145.) Plaintiff requested a follow-up visit with Dr. Georgostathis, but Dr. Rush allegedly became upset, emphasized his own experience, and instructed Plaintiff to decide at a later visit whether he would proceed with surgery. (*Id*.)

On April 4, 2023, Plaintiff returned to the GHCF medical clinic, where NP Ashong informed him that she had replaced NP Acrish as his primary care provider. (*Id*. ¶ 146.) Plaintiff reported side effects from medication, stomach pain, diarrhea, and back pain, and requested that his prior diagnostic records—including CAT scans, MRIs, and endoscopy results—be reviewed. (*Id*.) Plaintiff alleges that NP Ashong refused to review those records and documented only his complaint of testicular pain. (*Id*.) Later that month, Plaintiff underwent an ultrasound performed by a private specialist identified only as "James," who declined to provide a diagnosis and instead indicated that the results would be forwarded to another specialist. (*Id*. ¶ 147.) Plaintiff thereafter wrote to Dr. Bentivegna on April 17, 2023, describing what he characterized as a continued denial of medical care and copying that correspondence to supervisory officials, including DOCCS leadership and Defendant Ashong. (*Id*. ¶ 148.) On April 21, 2023, Plaintiff was again seen by Dr. Rush without a translator present. (*Id*. ¶ 149.) Plaintiff requested a second opinion at WMC, but Dr. Rush allegedly became upset and terminated the visit. (*Id*.)

In early May 2023, Plaintiff underwent an additional ultrasound, during which the technician identified a "black patch" on Plaintiff's testicle but did not provide further explanation. (*Id*. ¶ 150.) Plaintiff alleges that he never received the results of that test. (*Id*.) Plaintiff continued to submit written complaints throughout mid-2023, including letters to Dr. Bentivegna describing

worsening conditions and requesting transport to WMC for pending procedures.  (*Id*. ¶ 151.)  He also filed an additional grievance in June 2023 seeking specialist care, diagnostic testing, and treatment.  (*Id*. ¶ 152.)  RHSA Nayshuler responded to Plaintiff's complaints on June 27, 2023, stating that Plaintiff's care was being monitored and that he had received appropriate treatment, and advised him to continue working with his primary care provider.  (*Id*. ¶ 153.)

Plaintiff's grievance was subsequently denied by the Inmate Grievance Resolution Committee, which advised him to follow up with his primary care provider.  (*Id*. ¶ 155.)  Plaintiff appealed that determination and further complained that decisions were made without his presence at grievance hearings.  (*Id*. ¶¶ 155–156.)  His grievance appeal, however, was denied by the GHCF Superintendent, who concluded that Plaintiff had been appropriately diagnosed and treated.  (*Id*. ¶¶ 157–158.)

In September 2023, Plaintiff visited the GHCF medical clinic on an emergency basis with severe pain and reported a mass in his rectum.  (*Id*. ¶ 159.)  Medical staff initially questioned his complaints but, after examination, prescribed medication and directed him to return to the clinic regularly.  (*Id*. ¶¶ 159–160.)  Plaintiff alleges that, although the mass subsided after several days of medication, his other symptoms—including stomach and organ pain—persisted.  (*Id*. ¶ 161.)  Plaintiff alleges that he continued to suffer from ongoing symptoms, including abdominal pain, back pain, diarrhea, testicular pain, and other complications that affected his ability to sleep, eat, and engage in daily activities.  (*Id*. ¶ 162.)  Shortly thereafter, Plaintiff was transferred to several different correctional facilities.  (*Id*. ¶¶ 167–184.)  The Court need not address this factual background, however, as it does not pertain to the Defendants in this action.[3]

---

[3] Plaintiff was transferred from GHCF to Great Meadows Correctional Facility, then to Coxsackie Correctional Facility, and subsequently to Fishkill Correctional Facility.  (TAC ¶¶ 169–170, 180.)  During this period, Plaintiff was frequently transported to Albany Medical Center ("AMC"), where he alleges that doctors refused to listen to him.

### III.    Allegations of Inadequate Medical Care

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments, as well as Article I, § 5 of the New York State Constitution.    (TAC ¶¶ 4–5.)    Specifically, Plaintiff contends that, following his hospitalization for COVID-19 and related conditions in April 2020, Defendants—including primary care providers at GHCF and Vassar Brothers—failed to provide adequate medical care despite his persistent complaints of severe and worsening symptoms. (*Id*. ¶¶ 189–191.)  Plaintiff further alleges that Vassar Brothers personnel administered multiple medications without his informed consent and failed to disclose associated risks, and that GHCF medical staff, including NP Acrish and supervisory officials, repeatedly ignored or dismissed his complaints, declined to order appropriate diagnostic testing, withheld medical records, and failed to arrange necessary follow-up care, including specialist evaluations and recommended monitoring of a pancreatic tumor.  (*Id*.)  Plaintiff also alleges that correctional staff delayed or interfered with his access to treatment and that his grievances and appeals were routinely denied despite his ongoing condition. (*Id*.)  As a result, Plaintiff claims to have suffered prolonged pain, deterioration of his health, and other physical and emotional injuries, and now seeks declaratory relief and damages.  (*Id*. ¶ 191.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on October 13, 2021. (ECF No. 1.)  On December 7, 2022, the Court dismissed the Complaint in its entirety and granted Plaintiff leave to file an Amended Complaint.  (ECF No. 95.)  Plaintiff filed the Amended Complaint on July 31, 2023.  (ECF No. 117.)  On August 14, 2023, Plaintiff informed the Court that he had neglected to include claims against certain Defendants.  (ECF No. 127.)  The Court permitted Plaintiff to file a Second

---

(*See, e.g., id*. ¶¶ 171, 174, 176, 181.)  Plaintiff also alleges that he was assaulted on several different occasions by other inmates.  (*Id*. ¶¶ 168, 184.)

Amended Complaint, (ECF No. 136), which he filed on November 15, 2023. (ECF No. 149.) On November 25, 2024, the Court dismissed the Second Amended Complaint in its entirety and again granted Plaintiff leave to file a TAC. (ECF No. 209.) Plaintiff filed the TAC on February 10, 2025. (ECF No. 215.)

The State Defendants, Vassar Defendants, Dr. Gendron, and Dr. Wolstein moved to dismiss the TAC on March 31, 2025. (ECF Nos. 216–219.) The Court waived the pre-motion conference and set a briefing schedule. (ECF No. 222.) Defendants served their opening papers on May 14, 2025. (ECF Nos. 242–243, 246, 248–249.) After granting several extensions, (ECF Nos. 228, 230, 233), the Court received Plaintiff's opposition papers on October 17, 2025. (ECF Nos. 238, 239.) Defendants filed replies in further support of their Motions on November 14, 2025. (ECF Nos. 245, 247, 250.)

## LEGAL STANDARD

### I.    Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (citation and internal quotations omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In assessing whether there is subject matter jurisdiction, the district court must accept as true all material facts alleged in the complaint. *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009). Without jurisdiction, the district court is devoid of the "power to adjudicate the merits of the case," and therefore must decide a motion under Federal Rule of Civil Procedure 12(b)(1) before

14

addressing any motion on the merits. *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 55 (2d Cir. 2016).

## II.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.  While the district court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, it is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rotham v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted).  The critical inquiry is whether a plaintiff has pled sufficient facts to nudge their claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Where a *pro se* plaintiff is concerned, district courts must construe the pleadings in a particularly liberal fashion. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  In fact, district courts must interpret the *pro se* plaintiff's pleading "to raise the strongest arguments that [it] suggest[s]."

*Harris v. City of New York*, 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation omitted). Nevertheless, a *pro se* plaintiff's pleadings must contain factual allegations that sufficiently "raise a right to relief above the speculative level," *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010), and the district court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write it," *Geldzahler v. N.Y. Med. College*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

## III.    Section 1983 Claims

"Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)). "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam)); *see also Ross v. Westchester Cnty. Jail*, 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012). A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his constitutional rights. *Ross*, 2012 WL 86467, at *9 (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). Additionally, a plaintiff seeking monetary damages against the defendant must show personal involvement on the part of the defendant in the alleged constitutional deprivation as a prerequisite to recovery under § 1983. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).

## DISCUSSION

There are currently four separate motions, each advancing several arguments for dismissal.[4] (ECF Nos. 242–243, 246, 248–249.) At the outset, Plaintiff voluntarily dismissed all claims against Dr. Gendron.[5] (ECF No. 223 at 2.) Three motions therefore remain for the Court's consideration, filed by (1) the Vassar Defendants; (2) Dr. Wolstein; (3) and the State Defendants. Because Plaintiff's claims against the Vassar Defendants and Dr. Wolstein derive from his hospitalization at Vassar Brothers, the Court first considers those arguments. The Court then addresses the arguments advanced by the State Defendants.

## I.  Claims Against Vassar Defendants and Dr. Wolstein

### A.  Lack of State Action

As previously asserted throughout this action, the Vassar Defendants and Dr. Wolstein renew their argument that they are not "state actors" within the meaning of § 1983.[6] (Vassar Mem. at 5; Wolstein Mem. at 3.) The Court has agreed with this conclusion on two prior occasions, dismissing all claims against the Vassar Defendants and Dr. Wolstein. *See Illescas v. Annucci*, 2022 WL 17539696, at *4 (S.D.N.Y. Dec. 7, 2022); *Illescas v. Annuci*, 2024 WL 4882774, at *5 (S.D.N.Y. Nov. 25, 2024). In its prior decision dismissing the Second Amended Complaint, the

---

[4] A review of the docket reflects that the Vassar Defendants' motion was inadvertently filed twice—one including Dr. Ojeda-Martinez and one omitting him. (ECF Nos. 248–249.) The Court nonetheless construes the arguments raised on behalf of the Vassar Defendants as applying equally to Dr. Ojeda-Martinez.

[5] Plaintiff wrote to the Court on April 16, 2025, stating that he had inadvertently named Dr. Gendron in the TAC and wished to withdraw all claims against him. (ECF No. 223 at 2.) The Court therefore dismisses all claims against Dr. Gendron with prejudice, consistent with Plaintiff's request.

[6] The Vassar Defendants and Dr. Wolstein also argue that the Public Readiness and Emergency Preparedness Act ("PREP Act") deprives this Court of subject matter jurisdiction. (Vassar Mem. at 15; Wolstein Mem. at 8.) The Court is not persuaded. The PREP Act provides immunity from suit for certain claims relating to covered countermeasures and creates a limited federal cause of action for willful misconduct, which must be brought in the United States District Court for the District of Columbia. *See Solomon v. St. Joseph Hosp.*, 62 F.4th 54, 58 (2d Cir. 2023) (citing 42 U.S.C. § 247d-6d(e)(1)); *Perez v. Oxford Univ.*, 2022 WL 1446543, at *5 (S.D.N.Y. Apr. 11, 2022) (same), *report and recommendation adopted*, 2022 WL 1468438 (S.D.N.Y. May 10, 2022); *Perez v. Evans*, 2025 WL 2933587, at *12 (S.D.N.Y. May 15, 2025) (same), *report and recommendation adopted*, 2025 WL 2726792 (S.D.N.Y. Sept. 25, 2025). Plaintiff does not assert a claim under the PREP Act, nor does he plausibly allege willful misconduct within the meaning of the statute. (TAC ¶¶ 4–5.) Defendants therefore have not shown that the PREP Act divests this Court of subject matter jurisdiction over Plaintiff's claims.

Court relied on the law-of-the-case doctrine, concluding that the Second Amended Complaint failed to cure the deficiencies identified in the earlier complaints. *Illescas*, 2024 WL 4882774, at *5. The Court again concludes that the TAC suffers from the same deficiencies.

To state a claim under § 1983, plaintiff bears the burden of alleging facts indicating that "official action" has resulted in the deprivation of constitutional rights. *Zherka*, 634 F.3d at 644 (citing *Colombo*, 310 F.3d at 117). "[M]ere conclusory allegation[s] that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (cleaned up). As the Court explained in its prior ruling, district courts employ three separate tests to determine whether a private actor's conduct can be considered state action for purposes of § 1983: (1) the compulsion test; (2) the nexus test; and (3) the public function test. *See Illescas*, 2024 WL 4882774, at *4 (citing *Wilson v. HSBC Bank, USA*, 2018 WL 1449204, at *14 (S.D.N.Y. Mar. 22, 2018)). If a plaintiff fails to satisfy any of the relevant tests, their § 1983 claims must be dismissed. *Id*. Even so, where a plaintiff proceeds *pro se*, district courts generally grant leave to amend to afford an opportunity to cure such deficiencies, as the Court has done here. *See Illescas*, 2022 WL 17539696, at *8; *Illescas*, 2024 WL 4882774, at *6.

Notwithstanding a district court's decision to grant leave to amend, the law-of-the-case doctrine "holds that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Delville v. Firmenich Inc.*, 23 F. Supp. 3d 414, 425 (S.D.N.Y. 2014) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)); *see also In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) (noting that while not binding, the law-of-the-case doctrine counsels against a court revisiting prior rulings absent compelling reasons such as the need to correct a clear error or

18

prevent manifest injustice); *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (same).  Indeed, even in the context of *pro se* plaintiffs, when an amended complaint "provides no new information that could serve as a 'cogent and compelling' basis for the Court to deviate from its prior ruling," those claims must be dismissed.  *See, e.g.*, *Rodriguez v. Westchester Cnty.*, 2025 WL 1939292, at *2 (S.D.N.Y. July 15, 2025) (dismissing Eighth Amendment claims where *pro se* plaintiff failed to plausibly allege new factual allegations in the amended complaint).

The Court need not entertain further argument as to whether the Vassar Defendants or Dr. Wolstein are state actors for purposes of § 1983.  The Court has already determined that Plaintiff failed to plausibly allege that the Vassar Defendants and Dr. Wolstein were state actors and further concluded that the Second Amended Complaint was devoid of facts satisfying any of the three tests described above.  *See Illescas*, 2024 WL 4882774, at *5.  The Court nevertheless granted Plaintiff leave to file the TAC to cure these deficiencies.  *Id*. at *6.  In response, the TAC merely alleges that the Vassar Defendants and Dr. Wolstein were somehow "willful participant[s] . . . under the direction of . . . GHCF and DOCCS."  (TAC ¶ 44.)  The TAC likewise alleges—without sufficient examples—that the Vassar Defendants and Dr. Wolstein "were provided significant encouragement from . . . GHCF and DOCCS" when caring for him at Vassar Brothers.  (*Id*. ¶ 43.)  Plaintiff likewise contends in his opposition that Dr. Wolstein was "ordered" by GHCF and DOCCS to administer medications to Plaintiff without his consent, "clearly showing . . . willful participant in joint activity with the State."  (Pl. Opp. at 7.)  Despite these baseless allegations, the Vassar Defendants and Dr. Wolstein were not employed by GHCF or DOCCS during the relevant period.  (TAC § IV.)  Nothing in the TAC alleges otherwise.  Nor does Plaintiff provide any factual allegations demonstrating how the Vassar Defendants' and Dr. Wolstein's treatment of Plaintiff at Vassar Brothers constituted "joint activity with the State."  *See McDay v. Martuscello*, 2026 WL

19

836797, at \*3 (S.D.N.Y. Mar. 26, 2026) (dismissing § 1983 claims against private actors where plaintiff alleged only that they were "engaged in a conspiracy" and were "willful participant[s] in joint activity with the State).

Unless certain rare conditions exist, private hospitals such as Vassar Brothers are not state actors for purposes of § 1983. *See Amofa v. Bronx-Lebanon Hosp. Ctr.*, 2006 WL 3316278, at \*4 (S.D.N.Y. Nov. 13, 2006) (dismissing claims against hospital defendant because "[t]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful"); *Kia P. v. McIntyre*, 235 F.3d 749, 756 (2d Cir. 2000) ("The Hospital is owned and administered by a private corporation; it is not a state or municipal facility."); *Doe v. Rosenberg*, 996 F. Supp. 343, 348–58 (S.D.N.Y. 1998) (defendant hospital did not meet the "state compulsion," "public function," or "close nexus" tests for state action), *aff'd*, 166 F.3d 507 (2d Cir. 1999) (per curiam). This principle holds true even when a private physician—such as Dr. Wolstein—is treating an inmate. *See Engles v. Corigliano*, 2025 WL 4356731, at \*5 (N.D.N.Y. Dec. 8, 2025) (finding physician defendant was not acting under color of law where physician was "not employed by the Bureau of Prisons, nor was he under contract with the state to render medical services to prison inmates"), *report and recommendation adopted*, 2026 WL 527011 (N.D.N.Y. Feb. 25, 2026); *Nunez v. Horn*, 72 F. Supp. 2d 24, 27 (N.D.N.Y. 1999) (same); *Rosseter v. Annetts*, 2012 WL 4486082, at \*7 (N.D.N.Y. June 29, 2012), *report and recommendation adopted*, 2012 WL 4482858 (N.D.N.Y. Sept. 27, 2012) (same).

Consequently, the Court concludes that the TAC remains deficient for the reasons stated in its prior decisions. Plaintiff has again failed to plausibly allege that the Vassar Defendants and Dr. Wolstein are state actors for purposes of § 1983. Plaintiff's claims against the Vassar Defendants and Dr. Wolstein likewise fail under the law-of-the-case doctrine. The TAC provides no new

20

information that could serve as a "cogent and compelling" basis for the Court to deviate from its prior ruling dismissing Plaintiff's § 1983 claims in their entirety. *Delville*, 23 F. Supp. 3d at 425. Because this is Plaintiff's third attempt to assert such claims against the Vassar Defendants and Dr. Wolstein, those claims are dismissed with prejudice.

### B. State Law Claims and Supplemental Jurisdiction

Plaintiff also asserts a claim under Article I, § 5 of the New York State Constitution, as well as a potential state law claim for medical malpractice, against the Vassar Defendants and Dr. Wolstein. (TAC ¶ 5.) However, with Plaintiff's federal claims dismissed against the Vassar Defendants and Dr. Wolstein, "the state law claims should be dismissed as well." *Oneida Indian Nation of N.Y. v. Madison County*, 665 F.3d 408, 437 (2d Cir. 2011) (quoting *Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010)). Because Plaintiff's § 1983 claims—the only claims over which the Court has original jurisdiction—must be dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims asserted against the Vassar Defendants and Dr. Wolstein. *See Rodriguez*, 2025 WL 1939292, at \*3 (a district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction") (quoting 28 U.S.C. § 1367(c)).

## II. Claims Against State Defendants

The State Defendants advance several arguments for dismissal. Specifically, they contend that (1) Plaintiff's official capacity claims are barred by the Eleventh Amendment; (2) Plaintiff fails to allege the personal involvement of Defendants Annucci, Dr. Morley, Dr. Bentivegna, and RHSA Nayshuler; (3) Plaintiff fails to plausibly state a deliberate indifference claim against the remaining State Defendants, as the TAC reflects ongoing treatment and, at most, a disagreement with medical judgment; (4) Plaintiff's state law claims are barred by New York Correction Law §

24; and (5) they are entitled to qualified immunity because no constitutional violation is plausibly alleged and, in any event, any such right was not clearly established.  (*See generally* State Mem.) The Court addresses each in turn.

### A.  Threshold Matters

#### i.  Eleventh Amendment and Official Capacity Claims

At the outset, the Court must determine whether Plaintiff's official capacity claims for declaratory relief and compensatory damages against the State Defendants are barred by the Eleventh Amendment.  The State Defendants argue that such claims cannot proceed in light of sovereign immunity.  (State Mem. at 14.)  The Court previously reached this conclusion, *see Illescas*, 2022 WL 17539696, at *5, and reaches the same conclusion here.

Absent abrogation by Congress, a state is immune from suit in federal court.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–56 (1996); *see also Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir. 1990).  This immunity extends to "arms of the state," which includes "officers employed by agencies such as DOCCS."  *See Peck v. Annucci*, 2025 WL 3022454, at *7 (S.D.N.Y. Oct. 29, 2025) (dismissing § 1983 claims seeking monetary damages against Defendant Annucci and other DOCCS employees in their official capacities under the Eleventh Amendment); *Williams v. Annucci*, 2018 WL 3148362, at *10 (S.D.N.Y. June 27, 2018) (dismissing § 1983 claims seeking monetary damages against Defendant Annucci in his official capacity because they "cannot stand" in light of sovereign immunity); *Matteo v. Perez*, 2017 WL 4217142, at *7 (S.D.N.Y. Sept. 19, 2017) (dismissing § 1983 claims against DOCCS official because of Eleventh Amendment).  In other words, "[t]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents . . . that are, effectively, arms of a state."  *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009); *see also Will v. Michigan Dep't of State Police*, 491 U.S.

58, 71 (1989) (a suit against a state official in their official capacity is "not a suit against the official but rather is a suit against the official's office").

In the context of § 1983, claims against state officers in their official capacities must be dismissed because such officials are not considered "person[s]" within the meaning of the statute. *See Reynolds v. Barrett*, 685 F.3d 193, 204 (2d Cir. 2012); *see also Koehl v. Dalsheim*, 85 F.3d 86, 88–89 (2d Cir. 1996) (affirming dismissal of § 1983 claims against DOCCS superintendent in official capacity). A limited exception exists, however. State officials may be sued in their official capacities where the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *See Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 254–56 (2011) (citing *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *Ex parte Young*, 209 U.S. 123 (1908)); *see also Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 152 (2d Cir. 2013), *cert. dismissed*, 569 U.S. 1040 (2013); *KM Enterprises, Inc. v. McDonald*, 518 Fed. Appx. 12, 13 (2d Cir. 2013). This exception does not apply when a plaintiff seeks money damages. *See Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 392 (2d Cir. 2022) ("[T]he Eleventh Amendment bars the award of money damages against state officials in their official capacities.")

Plaintiff seeks various forms of relief, including declaratory relief and monetary damages, based on the State Defendants' alleged deliberate indifference to Plaintiff's medical needs. (TAC ¶ 191.) However, the State Defendants, at least during the relevant periods of the instant action, were employed by GHCF and DOCCS, (*see id*. § IV), and are therefore "effectively, arms of [the] state." *Gollomp*, 568 F.3d at 366. Plaintiff is consequently barred from pursuing damages against them in their official capacities. *See Pineda v. Doe 1-2*, 2025 WL 2145661, at *3 (S.D.N.Y. July 29, 2025) ("The Eleventh Amendment therefore precludes Plaintiff's claims for damages under

23

Section 1983 against the individual defendants, in their official capacities, as officers of the State of New York.")  As explained above, "New York has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting Section 1983." *Javier v. Russo*, 2021 WL 4252061, at *5 (S.D.N.Y. Sept. 17, 2021) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977)); *see also Mamot v. Bd. of Regents*, 367 F. App'x. 191, 192 (2d Cir. 2010) ("It is well-established that New York has not consented to § 1983 suits in federal court, and that § 1983 was not intended to override a state's sovereign immunity.").  Nor does Plaintiff benefit from the exception for prospective relief, as the TAC does not seek such relief.  (TAC ¶ 191.)  Plaintiff's request for declaratory relief is likewise barred because "absent a request for prospective relief, the Eleventh Amendment bars declaratory relief in the form of a statement that Plaintiff's constitutional right has been violated in the past." *Mateo v. Westchester Cnty.*, 2020 WL 5802838, at *5 (S.D.N.Y. Sept. 29, 2020).  Claims against the State Defendants in their official capacities are therefore dismissed with prejudice.

### ii.  Lack of Personal Involvement

The Court next determines whether certain State Defendants have the requisite personal involvement for § 1983 claims.  Specifically, the State Defendants argue that Plaintiff fails to plausibly allege that Defendants Annucci, Dr. Morley, Dr. Bentivegna, and RHSA Nayshuler were personally involved in his medical treatment.  (State Mem. at 8.)  In response, Plaintiff argues that these Defendants read and responded to letters, failed to discipline subordinates, denied his request to change his primary provider, and maintained an "informal policy" of indifferent deliberateness.  (Pl. Opp. 18–22.)  However, as the Court has ruled twice before, *Illescas*, 2022 WL 17539696, at *4; *Illescas*, 2024 WL 4882774, at *4, the TAC still fails to cure the deficiencies identified in the prior complaints.

24

It is well settled that "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Corbett v. Annucci*, 2018 WL 919832, at *6 (S.D.N.Y. Feb. 13, 2018) (same). To the contrary, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quoting *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004)). In the context of supervisory liability, the Second Circuit has explained that "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

In this case, to state an Eighth Amendment claim for inadequate medical care, a plaintiff must demonstrate (1) an objectively serious medical need, which "exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) a defendant's subjective "deliberate indifference," that is, whether the prison official acted with a sufficiently culpable state of mind. *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000). Deliberate indifference in this context "means the official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Tangreti*, 983 F.3d at 619 (citing *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020)). Plaintiff must therefore establish that Defendants Annucci, Dr. Morley, Dr. Bentivegna, and RHSA Nayshuler violated the Eighth Amendment through their own conduct.

25

Applying these principles, Plaintiff still fails to plausibly allege the personal involvement of the above-referenced Defendants.  Beginning with Defendant Annucci, the TAC is devoid of any factual allegations suggesting that he was personally involved in Plaintiff's medical care.  (*See generally* TAC.)  Aside from Plaintiff alleging that he sent a letter to Defendant Annucci on April 17, 2023 detailing his medical conditions, the TAC contains no other allegations concerning Defendant Annucci beyond listing his name in the caption, list of defendants, and prayer for relief.  (*Id*. § IV, ¶¶ 148, 191.)  As this Court has previously held, Plaintiff cannot maintain a § 1983 claim based solely on Defendant Annucci's high-ranking position within DOCCS.  *Illescas*, 2022 WL 17539696, at *5 (citing *Black*, 76 F.3d at 74); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (holding that DOCCS Commissioner was not personally involved simply because Plaintiff wrote to him); *Bonie v. Annucci*, 2023 WL 2711349, at *6 (S.D.N.Y. Mar. 30, 2023) (Defendant Annucci's "receipt of letters or grievances, by itself, does not amount to personal involvement"); *Sierra v. Doe 22*, 2024 WL 866866, at *4 (N.D.N.Y. Jan. 26, 2024) ("Defendant Annucci's alleged receipt of letters from Plaintiff's family members is insufficient to demonstrate Defendant Annucci's personal involvement in the alleged violation of Plaintiff's rights."), *report and recommendation adopted sub nom. Sierra v. Zerniak*, 2024 WL 865866 (N.D.N.Y. Feb. 28, 2024).

Plaintiff's claims against Dr. Morley fare no better.  Plaintiff alleges that he wrote two letters to Dr. Morley on March 10, 2021, and April 17, 2023, respectively, explaining how his medical treatment provided by NP Acrish was inadequate.  (TAC ¶¶ 85, 148.)  Plaintiff further alleges that Dr. Morley did not respond and instead had RHSA Nayshuler respond with respect to the March 10, 2021 letter.  (*Id*. ¶ 86.)  However, as the Court previously determined, "the receipt of letters or grievances, by itself, does not amount to personal involvement."  *Illescas*, 2022 WL 17539696, at *5 (quoting *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010)).  Courts in

this Circuit agree with this principle. *See, e.g.*, *Sealey*, 116 F.3d at 51 (DOCCS official had no personal involvement when plaintiff wrote him two letters); *Bonie*, 2023 WL 2711349, at *6 ("The receipt of letters or grievances, by itself, does not amount to personal involvement" and dismissing plaintiff's claims against DOCCS officials despite defendant's alleged receipt of multiple grievances); *McIntosh v. United States*, 2016 WL 1274585, at *16 (S.D.N.Y. Mar. 31, 2016) ("[M]ere receipt of a complaint or grievance from an inmate is insufficient to establish personal involvement."). Moreover, if district courts found personal involvement every time a supervisor forwarded a complaint to a subordinate, the requirement would lose all meaning. *See Amaker v. Goord*, 2002 WL 523371, at *16 (S.D.N.Y. Mar. 29, 2002) ("[DOCCS official] testified that he receives thousands of letters each year, . . . and that his office generally forwarded the letters to the appropriate personnel to handle the problems in question."). Personal involvement requires more than that.

Plaintiff's claims against Dr. Bentivegna likewise fail. Plaintiff alleges that, on several occasions, he wrote to Dr. Bentivegna requesting that he change his primary care provider on the ground that NP Acrish had ignored his medical symptoms. (*See, e.g.*, TAC ¶¶ 65–66, 69–70, 104–105, 117, 129, 148, 151, 154.) However, as stated above, the receipt of letters alone is insufficient to plausibly allege personal involvement in the § 1983 context. *See, e.g.*, *Mateo*, 682 F. Supp. 2d at 430. Nor does Plaintiff—as an incarcerated individual—have a constitutional right to be assigned a medical provider of his choice. *See Harrison v. City of New York*, 2017 WL 4162340, at *5 (S.D.N.Y. Sept. 19, 2017) ("[T]here is no right to the medical treatment of one's choice"); *Pearsall v. Sposato*, 2018 WL 1611385, at *5 (E.D.N.Y. Mar. 31, 2018) (same); *Patterson v. Lilley*, 2003 WL 21507345, at *5 (S.D.N.Y. June 30, 2003) (same). While Plaintiff further alleges that Dr. Bentivegna ignored his requests for offsite medical care, (TAC ¶¶ 133, 157), such allegations

27

are contradicted by the TAC itself. Plaintiff was transported to MMVH, WMC, and PHC on multiple occasions for examination and treatment. (*See, e.g.*, *id*. ¶¶ 78, 108–110, 139.) Plaintiff even concedes that the State Defendants had him examined by a private specialist. (*Id*. ¶ 147.) Notwithstanding these contradictions, the fact that an inmate might prefer an alternative treatment, or feel that he did not receive the level of medical attention he preferred, does not constitute deliberate indifference. *See Harrison*, 2017 WL 4162340, at \*5 (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)). Plaintiff's claims against RHSA Nayshuler falter for the same reason. Plaintiff alleges only that she received, responded to, and disagreed with two letters sent by Plaintiff on March 21, 2021, and November 4, 2022, respectively. (TAC ¶¶ 86, 128.) For the reasons stated above, these allegations are insufficient to plausibly allege her personal involvement.

As before, the Court concludes that Plaintiff has failed to plausibly allege the personal involvement of Defendants Annucci, Dr. Morley, Dr. Bentivegna, and RHSA Nayshuler. The Court will not continue to entertain such arguments, as Plaintiff has already afforded multiple opportunities to amend his pleadings. With that said, the Court dismisses all claims against Defendants Annucci, Dr. Morley, Dr. Bentivegna, and RHSA Nayshuler with prejudice.

### iii.  Fourteenth Amendment Claims

Turning to the final threshold issue, Plaintiff alleges that the State Defendants violated his Fourteenth Amendment rights by subjecting him to "deliberate indifference and cruel and unusual punishment." (TAC ¶ 4.) Although Plaintiff does not distinguish which type of Fourteenth Amendment violation he pursues, the Court assumes that he is alleging a violation of his substantive due process rights. As discussed in more detail below, however, Plaintiff is already

pursuing an Eighth Amendment claim against the State Defendants seeking the same relief for the same factual circumstances.  (TAC ¶¶ 4, 191.)

Where, as here, a plaintiff's Eighth Amendment and Fourteenth Amendment claims "overlap, the due process claim will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners." *Rodriguez v. Morton*, 2009 WL 414033, at *9 (S.D.N.Y. Feb. 13, 2009) (quoting *Felix–Torres v. Graham*, 521 F. Supp. 2d 157, 162 (N.D.N.Y. 2007)).  Indeed, when a plaintiff alleges "deliberate indifference to [their] medical needs" under the Fourteenth Amendment, such "claim[s] must be dismissed as duplicative of the Eighth Amendment claims." *Madison v. Mazzuca*, 2004 WL 3037730, at *10 (S.D.N.Y. Dec. 30, 2004). Plaintiff's substantive due process claims are therefore dismissed with prejudice as duplicative. *See Bruno v. Annucci*, 2023 WL 2601947, at *8 (W.D.N.Y. Mar. 22, 2023) (dismissing inmate plaintiff's substantive due process claim alleging denial of "adequate medical treatment" because it was "at best redundant of that provided by the Eighth Amendment"); *Fitzgerald v. Oakes*, 2020 WL 2839327, at *4 (W.D.N.Y. June 1, 2020) (finding that because plaintiff's claims were "within the purview of the Eighth Amendment's prohibition on cruel and unusual punishment, . . . his substantive due process claims are subject to dismissal"); *Kaminski v. Oniyuke*, 2019 WL 1877075, at *4 (D. Conn. Apr. 26, 2019) (holding that, on initial screening of the complaint, "if [the plaintiff's] substantive due process claim is based on the same action(s) that gave rise to his Eighth Amendment claim for deliberate indifference to medical needs, then his due process claim will be dismissed").

### B.  Individual Capacity Claims

The Court next turns to the individual capacity claims against the remaining State Defendants: NP Acrish, Dr. Mohamme, Dr. Kim, Dr. Odeniyi, NP Ashong, RN Thompson, John

Doe #1, John Doe #2, and John Doe #3.[7]  The State Defendants contend that Plaintiff fails to state a deliberate indifference claim because the TAC, by its own allegations, reflects ongoing and responsive medical treatment and, at most, a disagreement over the adequacy of that care.  (State Mem. at 10–13.)  In response, Plaintiff contends that Defendants were deliberately indifferent by refusing to provide adequate treatment, disregarding his persistent complaints, and delaying or denying necessary diagnostic procedures and specialist care, resulting in prolonged pain and worsening medical conditions.  (Pl. Opp. at 14–16; 19–20.)  The Court disagrees.

At its core, Plaintiff's claims against the remaining State Defendants are premised on an alleged deprivation of medical care in violation of the Eighth Amendment.  Whether analyzed under the Eighth or the Fourteenth Amendment, to plead a civil rights violation pursuant to § 1983 for inadequate medical care, a prisoner must allege "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Harrison*, 219 F.3d at 136.  For liability to attach under this standard, a plaintiff must demonstrate that a healthcare provider acted or failed to act with reckless disregard for the plaintiff's health or safety. *Harrison*, 2017 WL 4162340, at *4 (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).  As briefly discussed above, in order "[t]o succeed in showing deliberate indifference, [a plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger." *LaBounty v. Coughlin*, 137 F.3d 68, 72–73 (2d Cir. 1988).  "Yet not every lapse in medical care is a constitutional wrong.  Rather, a prison official violates the Eighth Amendment

---

[7] The State Defendants represent that no doctor by the name of "Mohamme" was employed at GHCF during the relevant period of this action.  (State Mem. at 1 n.1.)  The docket further reflects that Dr. Mohamme has not been served.  (*See, e.g.*, ECF No. 143.)  The identity of Dr. Mohamme has been at issue since this action was commenced in 2021.  At one point, the Court issued a Valentin Order to ascertain his identity, but that order became moot when Plaintiff filed his Second Amended Complaint and did not assert claims against him.  (ECF No. 161.)  Plaintiff now again purports to assert claims against Dr. Mohamme.  (*See* generally TAC.)  In any event, regardless of Dr. Mohamme's identity or employment status, Plaintiff fails to plausibly allege any claim against him, as discussed below.

only when two requirements"—one objective and one subjective—"are met." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), *overruled in part on other grounds by Kravitz v. Purcell*, 87 F.4th 111 (2d Cir. 2023).

The objective element requires that "the alleged deprivation of adequate medical care . . . be sufficiently serious." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). Under this element, the Court must ask (1) "whether the prisoner was actually deprived of adequate medical care" and (2) if so, "whether the inadequacy in medical care is sufficiently serious." *Latouche v. Hammer*, 2023 WL 4867795, at *2 (S.D.N.Y. July 31, 2023). Only "deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Because a "prison official's duty is only to provide reasonable care," *Salahuddin*, 467 F.3d at 279 (citing *Farmer*, 511 U.S. at 844–47), "prison officials are liable only if they fail to take reasonable measures in response to a medical condition." *Rutherford v. Correct Care Sols.*, LLC, 2020 WL 550701, at *5 (S.D.N.Y. Feb. 4, 2020).

The subjective component requires a plaintiff to plausibly allege that the official acted with deliberate indifference to the inmate's health. *See Latouche*, 2023 WL 4867795, at *2. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id*. This means that defendants must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). A defendant's awareness of the risk of serious harm can be established through "inference from circumstantial evidence," including "from the very fact that the risk was obvious." *Jamie v. DOCCS*, 2026 WL 851352, at *5 (S.D.N.Y. Mar. 26, 2026) (citing *Farmer*, 511 U.S. at 842); *see*

31

*also Upson v. Wilson*, 2025 WL 547455, at *2 (2d Cir. Feb. 19, 2025) (summary order) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and . . .the very fact that the risk was obvious.").

Taken as true, liberally construed, and interpreted to raise the strongest possible arguments, the TAC fails to state a cognizable Eighth Amendment claim. At the outset, Plaintiff fails to satisfy the objective prong of the relevant standard because his allegations are contradicted by his own pleadings, which demonstrate the State Defendants' willingness to provide medical care. For instance, Plaintiff alleges that, on multiple occasions, NP Acrish deliberately ignored his medical symptoms. (*See, e.g.*, TAC ¶¶ 69, 104, 117.) However, the TAC reflects more than ten occasions on which Plaintiff was evaluated by NP Acrish. (*See, e.g.*, *id*. ¶¶ 56, 59–60, 73, 77–78, 81, 89, 96–97, 114, 124, 132.) The same is true for Dr. Mohamme, Dr. Kim, Dr. Odeniyi, NP Ashong, and RN Thompson. (*See, e.g.*, *id*. ¶¶ 121, 123, 126, 138.) During these appointments, the State Defendants conducted various examinations, including bloodwork, stool samples, urine samples, tuberculosis tests, and prescribed appropriate medications. (*See, e.g.*, *id*. ¶¶ 56, 60–61, 68, 77, 81.) Plaintiff's allegations of inadequate medical care are further belied by the fact that the State Defendants secured appointments for Plaintiff at outside hospitals, including MMVH, WMC, and PHC, where he underwent CAT scans, MRIs, colonoscopies, endoscopies, and other relevant medical evaluations. (*See, e.g.*, *id*. ¶¶ 78, 108–109, 140.) These allegations are further undermined by the fact that DOCCS also secured appointments for Plaintiff at AMC following his transfer from GHCF. (*See, e.g., id*. ¶¶ 171, 174–176, 181.) The State Defendants also arranged for Plaintiff to be evaluated by outside specialists, including Dr. Rush and "James," during which he underwent, among other things, ultrasounds. (*See, e.g.*, *id*. ¶¶ 141, 144–145, 147, 149.)

32

While Plaintiff may disagree with the State Defendants' approach to treatment, the Court reiterates that "[d]isagreements over medications, diagnostic techniques . . ., forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001); *see also Rodriguez v. Westchester Cnty.*, 2024 WL 4390222, at *2 (S.D.N.Y. Oct. 3, 2024) ("Plaintiff's own complaint indicates that he received treatment—the issue was that Plaintiff just disagreed as to the treatment received and the location where treatment was administered . . . [which] does not constitute deliberate indifference and/or negligent medical treatment."); *Bernel v. Korobkova*, 2023 WL 6146600, at *7 (S.D.N.Y. Sept. 19, 2023) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (The Eighth Amendment is not implicated by prisoners' complaints over the adequacy of the care they received when those claims amount to a disagreement over the appropriateness of a particular prescription plan."), *aff'd*, 178 F. App'x 39 (2d Cir. 2006).

Plaintiff likewise fails to satisfy the subjective prong of the relevant standard. The TAC is devoid of any allegations that the State Defendants knew of and intentionally disregarded Plaintiff's medical needs. To the contrary, and as discussed above, the TAC reflects that the State Defendants provided Plaintiff with repeated evaluations, appointments, and medication. To the extent Plaintiff alleges that the State Defendants misdiagnosed him, those claims similarly fail because "[a]llegations of . . . misdiagnosis . . . [do not] state a cause of action under the Eighth Amendment." *Harris v. Westchester Cnty. Med. Ctr.*, 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011). Indeed, "[m]edical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—'an act or a failure to act by [a] prison doctor that

evinces a conscious disregard of a substantial risk of serious harm.'" *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)); *see also Estelle*, 429 U.S. at 105–06 (noting that an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind"); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (observing that "negligent malpractice do[es] not state a claim of deliberate indifference"); *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). Plaintiff cannot complain that the State Defendants were "negligent in diagnosing or treating a medical condition [because that] does not state a valid claim of medical mistreatment under the Eighth Amendment." *Bright v. Annucci*, 2024 WL 3012043, at *7 (S.D.N.Y. June 13, 2024) (quoting *Estelle*, 429 U.S. at 106).

Plaintiff's allegations against Defendants John Doe #1, John Doe #2, and John Doe #3 fare no better. Plaintiff alleges that he was required to wait to see NP Acrish, was given mild or allegedly expired medication, and experienced a brief delay in transport to a hospital. (TAC ¶¶ 92, 94, 111.) These allegations, even if true, do not plausibly establish that these Defendants consciously disregarded a substantial risk to Plaintiff's health. When "the prisoner is receiving appropriate on-going treatment for his condition [and] brings a . . . denial of medical care claim based on a temporary delay or interruption in treatment," district courts look to "the severity of the temporary deprivation alleged by the prisoner," not "the severity of the prisoner's underlying medical condition." *Rutherford*, 2020 WL 550701, at *6 (quoting *Smith*, 316 F.3d at 186). At most, Plaintiff alleges temporary delays or disagreements over the adequacy and timing of treatment, which are insufficient to state an Eighth Amendment claim. Indeed, Plaintiff alleges

34

that John Does #1 and #2 denied him treatment for less than a week, and that John Doe #3 delayed his access to WMC for approximately one hour.  (TAC ¶¶ 92, 94–96, 111.)  But "a short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.'"  *Labossiere v. Baxter*, 2025 WL 887623, at *6 (S.D.N.Y. Mar. 21, 2025) (quoting *Ferguson v. Cai*, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012)).  Plaintiff's claims thus fail to satisfy either the objective or subjective prong of the deliberate indifference standard.

The Court therefore concludes that Plaintiff fails to plausibly allege that any of the remaining State Defendants were deliberately indifferent to his medical needs.[8]  The Court has previously afforded Plaintiff multiple opportunities to amend, but the deficiencies in his pleadings remain.  Under these circumstances, further amendment would be futile, and dismissal is with prejudice.[9]

### C.  State Law Claims

Plaintiff also asserts a claim under Article I, § 5 of the New York State Constitution against the State Defendants.  (TAC ¶ 5.)  The State Defendants argue that, to the extent Plaintiff pursues state law claims, those claims are barred by New York Correction Law § 24.  (State Mem. at 13.)  The Court agrees.

A district court "may decline to exercise supplemental jurisdiction over [a pendent state law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction."

---

[8] Although the State Defendants argue that they are entitled to qualified immunity, (State. Mem. at 14–15), the Court need not address this argument because all claims have been dismissed.

[9] Plaintiff's additional allegations—that the State Defendants failed to respond to FOIL requests, destroyed medical records, and that he was assaulted by correction officers—do not alter this conclusion.  (Pl. Opp. at 12.)  As a preliminary matter, Plaintiff has now submitted four iterations of his pleadings and has had ample opportunity to present all relevant allegations in support of his claims.  These assertions do not bear on whether the State Defendants were deliberately indifferent to Plaintiff's medical needs and therefore do not support an Eighth Amendment claim for inadequate medical care.  Nor does Plaintiff allege facts sufficient to render these claims plausible.

35

28 U.S.C. § 1367(c)(3). Although this is not "a mandatory rule to be applied inflexibly in all cases, . . . in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law-claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (per curiam).

In any event, New York Correction Law § 24 independently requires that claims against DOCCS employees "arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties" be brought in the New York Court of Claims. *Olutosin v. Lee*, 2016 WL 2899275, at *12 (S.D.N.Y. May 16, 2016) (citing N.Y. Correct. Law § 24). "The Second Circuit has held that [New York Correction Law § 24] prevents federal courts from exercising pendent jurisdiction over state law claims appended to federal claims brought pursuant to 42 U.S.C. § 1983." *Sughrim v. New York*, 2020 WL 7047697, at *21 (S.D.N.Y. Nov. 30, 2020) (quoting *Hassell v. Fischer*, 96 F. Supp. 3d 370, 385 (S.D.N.Y. 2015)); *see also Brown v. Griffin*, 2019 WL 4688641, at *8 (S.D.N.Y. Sept. 25, 2019) (same); *Davis v. McCready*, 283 F. Supp. 3d 108, 124 (S.D.N.Y. 2017) (same); *Cruz v. New York*, 24 F. Supp. 3d 299, 309 (W.D.N.Y. 2014) (same).

Plaintiff does not allege that the State Defendants acted outside the scope of their employment with DOCCS. (*See generally* TAC); *see also Cruz*, 24 F. Supp. 3d at 310 (explaining that "[t]he test to determine whether the defendants' actions fall within the scope of their employment is whether the defendants' actions fall within the scope of their employment is whether the act was done while the servant was doing his master's work no matter how irregularly, or with what disregard of instructions"). The Court therefore dismisses Plaintiff's remaining state

36

law claims without prejudice for lack of subject matter jurisdiction, so that Plaintiff may refile them in the appropriate state court.

## IV.    Leave to Amend

The Court finally considers whether to permit Plaintiff a fourth opportunity to amend his pleadings. The Second Circuit has counseled that district courts should not dismiss a complaint with prejudice without first identifying the precise defects in the claims. *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (per curiam). At the same time, where a complaint's deficiencies are "substantive" rather than merely "inadequately or inartfully" pleaded, granting leave to amend would be futile and should be denied. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).

This Court has granted Plaintiff leave to amend on several different occasions. *See Illescas*, 2022 WL 17539696, at *8; *Illescas*, 2023 WL 5956284, at *3 (S.D.N.Y. Sept. 13, 2023); *Illescas*, 2024 WL 4882774, at *6. Although the TAC expands upon prior allegations, it fails for the same reasons as the Complaint, First Amended Complaint, and Second Amended Complaint. If anything, the TAC further underscores the State Defendants' efforts to provide Plaintiff with medical care. While *pro se* plaintiffs are generally afforded leave to amend, *see Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795–96 (2d Cir. 1999), a district court may deny such leave where amendment would be futile because the defects are substantive and cannot be cured through better pleading. *Cox v. Aversa*, 2020 WL 815476, at *5 (S.D.N.Y. Feb. 19, 2020) (quoting *Cuoco*, 222 F.3d at 112). That is the case here. Plaintiff's new allegations do not salvage his Eighth Amendment claims, and further amendment would be futile. The Court therefore declines to grant leave to amend. *See Ariel (UK) Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45–46 (2d Cir. 2008)

37

(district court did not exceed its discretion by not *sua sponte* granting leave to amend where Plaintiff had already amended complaint once and amendment would have been futile).

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are GRANTED in their entirety. All claims against the State Defendants—Anthony J. Annucci, Dr. John Morley, Dr. Robert V. Bentivegna, NP Albert Acrish, RHSA Susanna Nayshuler, Dr. "Mohamme," Dr. Kyoung Kim, Dr. Olayemi Odeniyi, NP Mary N. Ashong, RN Nicole T. Thompson, John Doe #1, John Doe #2, and John Doe #3—are dismissed with prejudice, except for Plaintiff's state law claims, which are dismissed without prejudice and may be refiled in the appropriate state court. All claims against Vassar Brothers Medical Center, Dr. Sajin A. Pillai, Dr. Bruce R. Gendron, Dr. Daniel E. Laurie, Dr. Hector Ojeda-Martinez, Dr. Robert U. Mmereole, Sehrish Shahid, and Dr. Jesse M. Wolstein are likewise dismissed with prejudice. The Court dismisses the TAC without leave to amend.

The Court respectfully directs the Clerk of Court to (1) terminate the Motions at ECF Nos. 242–243, 246, and 248–249; (2) terminate this action; and (3) mail a copy of this Order to *pro se* Plaintiff at the address listed on ECF and to show service on the docket.

SO ORDERED.

Dated: April 30, 2026
     White Plains, NY

_____
Nelson S. Román, U.S.D.J.

38